## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

FRANK CROSSON and )
BARBARA CROSSON, husband and wife, )
, )
  )
*Plaintiffs*, )
  )
v. )    Case No.  3:25-pq-00076
  )
SYNGENTA CROP PROTECTION LLC, )    COMPLAINT
SYNGENTA AG, and )    JURY TRIAL DEMANDED
CHEVRON U.S.A., INC., )
  )
*Defendants*. )
  )

## CIVIL COMPLAINT

Plaintiffs Frank Crosson and Barbara Crosson, by and through their undersigned counsel, hereby file this Complaint against Defendants SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, and CHEVRON U.S.A. INC directly into MDL No. 3004 in the United States District Court for the Southern District of Illinois. Plaintiffs file this *Complaint* as permitted by Case Management Order No. 1 (Doc. #16) entered by this Court on June 10, 2021, and allege as follows:

### I.    NATURE OF THE CASE

1.    Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("paraquat") developed, registered, formulated, distributed, and sold for use in the United States, including the State of Colorado.

2.    Defendants are companies and successors-in-interest to companies that

---

[1]    Paraquat dichloride (EPA Pesticide Chemical Code 061601) or paraquat methosulfate (EPA Pesticide Chemical Code 061602).

manufactured, distributed, and sold paraquat for use in Colorado, acted in concert with others who manufactured, distributed, and sold paraquat for use in Colorado, sold and used paraquat in Colorado, or owned property in Colorado where paraquat was used.

3.    Plaintiff Frank Crosson purchased and used in Colorado ICI-Chevron paraquat products and/or ICI-Syngenta paraquat products (collectively "Defendants' paraquat products" or "paraquat").

4.    Plaintiff Frank Crosson used Defendants' paraquat products regularly and frequently over a period of many years.

5.    Plaintiff Frank Crosson was diagnosed with Parkinson's disease caused by many years of regular, frequent, prolonged exposure to paraquat from Defendants' paraquat products. Plaintiff Barbara Crosson, wife of Plaintiff Frank Crosson, has suffered losses of the services and consortium of her husband as a result of his diagnosis of Parkinson's disease.

6.    Plaintiffs bring this suit against Defendants to recover damages for personal injuries and other damages alleged herein resulting from Plaintiff Frank Crosson's exposure to paraquat for many years while treating weeds on his family's property prior to planting in Cheraw, Colorado.

## II.    PARTIES

### A.  Plaintiffs

7.    Plaintiff Frank Crosson is a citizen and resident of the State of Colorado residing in Colorado Springs, Colorado (located in El Paso County).   Plaintiff Frank Crosson suffers Parkinson's disease ("PD") caused by exposure to paraquat[2] within the State of Colorado.

---

[2]    Unless the context indicates otherwise, references in this complaint to "paraquat" include the chemical compound paraquat dichloride and formulated herbicide products containing paraquat dichloride as an active ingredient.

8.      Plaintiff Barbara Crosson is a citizen and resident of the State of Colorado residing in Colorado Springs, Colorado (located in El Paso County) and is the lawful spouse of Plaintiff Frank Crosson.

**B. <u>Defendants</u>**

9.      Defendant Syngenta Crop Protection LLC ("SCPLLC") is a Delaware company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly owned subsidiary of Defendant Syngenta AG.

10.      Defendant Syngenta AG ("SAG") is a foreign corporation with its principal place of business in Basel, Switzerland.

11.      Defendant Chevron U.S.A., Inc. ("CUSA") is a Pennsylvania corporation with its principal place of business in San Ramon, California.

### III.      <u>JURISDICTION AND VENUE</u>

12.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of the Plaintiffs and the defendants and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.      Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district in that Plaintiffs' claims and injuries arise from Plaintiff Frank Crosson's exposure to and use of paraquat in this district, which was distributed and sold for use in this district, actually purchased or purchased for use in this district, and being used in this district when the exposures causing Plaintiff's injuries and damages occurred.

14.      The Federal District Court in which Plaintiffs would have filed this action in the absence of direct filing permitted by CMO #1 (Doc. #11) is the Western District of Colorado

(Transferee District Court).

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    Defendants and their predecessors.

#### *1. Syngenta Crop Protection LLC and Syngenta AG*

15.    In 1926, four British chemical companies merged to create the British company that then was known as Imperial Chemical Industries Ltd. and ultimately was known as Imperial Chemical Industries PLC ("ICI").

16.    In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which at various times was known as Atlas Chemical Industries Inc., ICI North America Inc., ICI America Inc., and ICI United States Inc., and ultimately was known as ICI Americas Inc. (collectively "ICI Americas").

17.    In or about 1992, ICI merged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, including the agrochemicals business it had operated at one time through a wholly owned British subsidiary known as Plant Protection Ltd. and later as a division within ICI, into a wholly owned British subsidiary known as ICI Bioscience Ltd.

18.    In 1993, ICI demerged its pharmaceuticals, agrochemicals, and specialty chemicals businesses, from which it created the Zeneca Group, with the British company Zeneca Group PLC as its ultimate parent company.

19.    As a result of ICI's demerger and creation of the Zeneca Group, ICI Bioscience Ltd. was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca Ltd., a wholly owned British subsidiary of Zeneca Group PLC.

20.    Before ICI's demerger and creation of the Zeneca Group, ICI had a Central

Toxicology Laboratory that performed and hired others to perform health and safety studies that were submitted to the U.S. Department of Agriculture ("USDA") and the U.S. Environmental Protection Agency ("EPA") to secure and maintain the registration of paraquat and other pesticides for use in the United States.

21.    As a result of ICI's demerger and creation of the Zeneca Group, ICI's Central Toxicology Laboratory became Zeneca Ltd.'s Central Toxicology Laboratory.

22.    After ICI's demerger and creation of the Zeneca Group, Zeneca Ltd.'s Central Toxicology Laboratory continued to perform and hire others to perform health and safety studies that were submitted to EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

23.    As a result of ICI's demerger and creation of the Zeneca Group, ICI Americas was demerged from ICI and merged into, renamed, or continued its business under the same or similar ownership and management as Zeneca, Inc. ("Zeneca"), a wholly owned subsidiary of Zeneca Group PLC organized under the laws of the State of Delaware.

24.    In 1996, the Swiss pharmaceutical and chemical companies Ciba-Geigy Ltd. and Sandoz AG merged to create the Novartis Group, with the Swiss company Novartis AG as the ultimate parent company.

25.    As a result of the merger that created the Novartis Group, Ciba-Geigy Corporation, a wholly owned subsidiary of Ciba-Geigy Ltd. organized under the laws of the State of New York, was merged into or continued its business under the same or similar ownership and management as Novartis Crop Protection, Inc. ("NCPI"), a wholly owned subsidiary of Novartis AG organized under the laws of the State of Delaware.

26.    In 1999, the Swedish pharmaceutical company Astra AB merged with Zeneca Group

5

PLC to create the British company AstraZeneca PLC, of which Zeneca Ltd. and Zeneca were wholly owned subsidiaries.

27.     In 2000, Novartis AG and AstraZeneca PLC spun off and merged the Novartis Group's crop protection and seeds businesses and AstraZeneca's agrochemicals business to create the Syngenta Group, a global group of companies focused solely on agribusiness, with Defendant Syngenta AG ("SAG") as the ultimate parent company.

28.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd. was merged into, renamed, or continued its business under the same or similar ownership and management as Syngenta Ltd., a wholly owned British subsidiary of SAG.

29.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Zeneca Ltd.'s Central Toxicology Laboratory became Syngenta Ltd.'s Central Toxicology Laboratory.

30.     Since the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, Syngenta Ltd.'s Central Toxicology Laboratory has continued to perform and hire others to perform health and safety studies for submission to the EPA to secure and maintain the registration of paraquat and other pesticides for use in the United States.

31.     As a result of the Novartis/AstraZeneca spinoff and merger that created the Syngenta Group, NCPI and Zeneca were merged into and renamed, or continued to do their business under the same or similar ownership and management, as Syngenta Crop Protection, Inc. ("SCPI"), a wholly owned subsidiary of SAG organized under the laws of the State of Delaware.

32.     In 2010, SCPI was converted into Defendant Syngenta Crop Protection LLC ("SCPLLC"), a wholly owned subsidiary of SAG organized and existing under the laws of the State of Delaware with its principal place of business in Greensboro, Colorado.

33.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Novartis AG.

34.     SAG is a successor in interest to the crop-protection business of its corporate predecessor AstraZeneca PLC.

35.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Group PLC.

36.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Imperial Chemical Industries PLC, previously known as Imperial Chemical Industries Ltd.

37.     SAG is a successor in interest to the crop-protection business of its corporate predecessor ICI Bioscience Ltd.

38.     SAG is a successor in interest to the crop-protection business of its corporate predecessor Plant Protection Ltd.

39.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor SCPI.

40.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor NCPI.

41.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Ciba-Geigy Corporation.

42.     SCPLLC is a successor in interest to the crop-protection business of its corporate predecessor Zeneca Inc.

43.     SCPLLC is a successor by merger or continuation of business to its corporate predecessor ICI Americas Inc., previously known as Atlas Chemical Industries Inc., ICI North

America Inc., ICI America Inc., and ICI United States Inc.

44.    SCPLLC is registered to do business in the State of Colorado, with its registered office in Martinsburg, Colorado.

45.    SCPLLC does substantial business in the State of Colorado, including El Paso County, Colorado, including the following:

a.    markets, advertises, distributes, sells, and delivers paraquat and other pesticides to distributors, dealers, applicators, and farmers in the State of Colorado, including El Paso County, Colorado;

b.    secures and maintains the registration of paraquat and other pesticides with the EPA and the Colorado Department of Agriculture & Consumer Services to enable itself and others to manufacture, distribute, sell, and use these products in the State of Colorado, including El Paso County, Colorado; and

c.    performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of pesticides in the State of Colorado, including El Paso County, Colorado.

46.    SAG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

47.    SAG is a holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SCPLLC.

48.    SAG is a management holding company.

49.    Syngenta Crop Protection AG ("SCPAG"), a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SAG's direct, wholly owned subsidiaries.

50.    SCPAG employs the global operational managers of production, distribution, and

marketing for the Syngenta Group's Crop Protection ("CP") and Seeds Divisions.

51.     The Syngenta Group's CP and Seeds Divisions are the business units through which SAG manages its CP and Seeds product lines.

52.     The Syngenta Group's CP and Seeds Divisions are not and have never been corporations or other legal entities.

53.     SCP AG directly and wholly owns Syngenta International AG ("SIAG").

54.     SIAG is the "nerve center" through which SAG manages the entire Syngenta Group.

55.     SIAG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

56.     SIAG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

57.     Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

58.     SAG is the indirect parent of SCPLLC through multiple layers of corporate ownership:

        a.   SAG directly and wholly owns Syngenta Participations AG;

        b.   Syngenta Participations AG directly and wholly owns Seeds JV C.V.;

        c.   Seeds JV C.V. directly and wholly owns Syngenta Corporation;

        d.   Syngenta Corporation directly and wholly owns Syngenta Seeds, LLC; and

        e.   Syngenta Seeds, LLC directly and wholly owns SCPLLC.

59.     Before SCPI was converted to SCPLLC, it was incorporated in Delaware, had its principal place of business in Colorado, and had its own board of directors.

60.    SCPI's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

61.    SAG has purposefully organized the Syngenta Group, including SCPLLC, in such a way as to attempt to evade the authority of courts in jurisdictions in which it does substantial business.

62.    Although the formal legal structure of the Syngenta Group is designed to suggest otherwise, SAG in fact exercises an unusually high degree of control over its country-specific business units, including SCPLLC, through a "matrix management'' system of functional reporting to global "Product Heads" in charge of the Syngenta Group's unincorporated Crop Protection and Seeds Divisions, and to global "Functional Heads" in charge of human resources, corporate affairs, global operations, research and development, legal and taxes, and finance.

63.    The lines of authority and control within the Syngenta Group do not follow its formal legal structure, but instead follow this global "functional" management structure.

64.    SAG controls the actions of its far-flung subsidiaries, including SCPLLC, through this global "functional" management structure.

65.    SAG's board of directors has established a Syngenta Executive Committee ("SEC"), which is responsible for the active leadership and the operative management of the Syngenta Group, including SPLLC.

66.    The SEC consists of the CEO and various global Heads, which currently are:

a.    The Chief Executive Officer;

b.    Group General Counsel;

c.    The President of Global Crop Protection;

d.    The Chief Financial Officer;

> e.   The President of Global Seeds; and
>
> f.   The Head of Human Resources.

67.    SIAG employs all of the members of the Executive Committee.

68.    Global Syngenta Group corporate policies require SAG subsidiaries, including SPLLC, to operate under the direction and control of the SEC and other unincorporated global management teams.

69.    SAG's board of directors meets five to six times a year.

70.    In contrast, SCPI's board of directors rarely met, either in person or by telephone, and met only a handful of times over the last decade before SCPI became SCPLLC.

71.    Most, if not all, of the SCPI board's formal actions, including selecting and removing SCPI officers, were taken by unanimous written consent pursuant to directions from the SEC or other Syngenta Group global or regional managers that were delivered via e-mail to SCPI board members.

72.    Since SCPI became SCPLLC, decisions that are nominally made by the board or managers of SCPLLC in fact continue to be directed by the SEC or other Syngenta Group global or regional managers.

73.    Similarly, Syngenta Seeds, Inc.'s board of directors appointed and removed SCPI board members at the direction of the SEC or other Syngenta Group global or regional managers.

74.    Since SCPI became SCPLLC, the appointment and removal of the manager(s) of SCPLLC continues to be directed by the SEC or other Syngenta Group global or regional managers.

75.    The management structure of the Syngenta Group's CP Division, of which SCPLLC is a part, is not defined by legal, corporate relationships, but by functional reporting relationships that disregard corporate boundaries.

11

76.     Atop the CP Division is the CP Leadership Team (or another body with a different name but substantially the same composition and functions), which includes the President of Global Crop Protection, the CP region Heads (including SCPLLC President Vern Hawkins), and various global corporate function Heads.

77.     The CP Leadership Team meets bi-monthly to develop strategy for new products, markets, and operational efficiencies and to monitor performance of the Syngenta Group's worldwide CP business.

78.     Under the CP Leadership Team are regional leadership teams, including the North America Regional Leadership Team (or another body with a different name but substantially the same composition and functions), which oversees the Syngenta Croup's U.S. and Canadian CP business (and when previously known as the NAFTA Regional Leadership Team, also oversaw the Syngenta Group's Mexican CP business).

79.     The North America Regional Leadership Team is chaired by SCPLLC's president and includes employees of SCPLLC and the Syngenta Group's Canadian CP company (and when previously known as the NAFTA Regional Leadership Team, also included employees of the Syngenta Group's Mexican CP company).

80.     The Syngenta Group's U.S. and Canadian CP companies, including SCPLLC, report to the North America Regional Leadership Team, which reports the CP Leadership Team, which reports to the SEC, which reports to SAG's board of directors.

81.     Some members of the North America Regional Leadership Team, including some SCPLLC employees, report or have in the past reported not to their nominal superiors within the companies that employ them, but directly to the Syngenta Group's global Heads.

82.     Syngenta Group global Heads that supervise SCPLLC employees participate and

have in the past participated in the performance reviews of these employees and in setting their compensation.

83.    The Syngenta Group's functional reporting lines have resulted in employees of companies, including SCPLLC, reporting to officers of remote parent companies, officers of affiliates with no corporate relationship other than through SAG, or officers of subsidiary companies.

84.    SCPLLC performs its functions according to its role in the CP Division structure:

a.    CP Division development projects are proposed at the global level, ranked and funded at the global level after input from functional entities such as the CP Leadership Team and the North America Regional Leadership Team, and given final approval by the SEC;

b.    New CP products are developed by certain Syngenta Group companies or functional groups that manage and conduct research and development functions for the entire CP Division;

c.    These products are then tested by other Syngenta Group companies, including SCPLLC, under the direction and supervision of the SEC, the CP Leadership Team, or other Syngenta Group global managers;

d.    Syngenta Group companies, including SCPLLC, do not contract with or compensate each other for this testing;

e.    Rather, the cost of such testing is included in the testing companies' operating budgets, which are established and approved by the Syngenta Group's global product development managers and the SEC;

f.    If a product shows promise based on this testing and the potential markets for the

product, either global or regional leaders (depending on whether the target market is global or regional), not individual Syngenta Group companies such as SCPLLC, decide whether to sell the product;

g.  Decisions to sell the product must be approved by the SEC; and

h.  The products that are sold all bear the same Syngenta trademark and logo.

85.    SCPLLC is subject to additional oversight and control by Syngenta Group global managers through a system of "reserved powers" established by SAG and applicable to all Syngenta Group companies.

86.    These "reserved powers" require Syngenta Croup companies to seek approval for certain decisions from higher levels within the Syngenta Group's functional reporting structure.

87.    For example, although SAG permits Syngenta Croup companies to handle small legal matters on their own, under the "reserved powers" system, SAG's Board of Directors must approve settlements of certain types of lawsuits against Syngenta Group companies, including SCPLLC, if their value exceeds an amount specified in the "reserved powers."

88.    Similarly, the appointments of senior managers at SCPLLC must be approved by higher levels than SCPLLC's own management, board of directors, or even its direct legal owner.

89.    Although SCPLLC takes the formal action necessary to appoint its own senior managers, this formal action is in fact merely the rubber-stamping of decisions that have already been made by the Syngenta Group's global management.

90.    Although SAG subsidiaries, including SCPLLC, pay lip service to legal formalities that give the appearance of authority to act independently, in practice many of their acts are directed or pre-approved by the Syngenta Group's global management.

91.    SAG and the global management of the Syngenta Group restrict the authority of

SCPLLC to act independently in areas including:

    a.  Product development;

    b.  Product testing (among other things, SAG and the global management of the Syngenta Group require SCPLLC to use Syngenta Ltd.'s Central Toxicology Laboratory to design, perform, or oversee product safety testing that SCPLLC submits to the EPA in support of the registrations of paraquat and other pesticides);

    c.  Production;

    d.  Marketing;

    e.  Sales;

    f.  Human resources;

    g.  Communications and public affairs;

    h.  Corporate structure and ownership

    i.  Asset sales and acquisitions

    j.  Key appointments to boards, committees and management positions;

    k.  Compensation packages;

    l.  Training for high-level positions; and

    m.  Finance (including day-to-day cash management) and tax.

92.    Under the Syngenta Group's functional management system, global managers initiate, and the global Head of Human Resources oversees, international assignments and compensation of managers employed by one Syngenta subsidiary to do temporary work for another Syngenta subsidiary in another country. This international assignment program aims, in part, to improve Syngenta Group-wide succession planning by developing corporate talent to make

employees fit for higher positions within the global Syngenta Group of companies.

93.    Under this international assignment program, at the instance of Syngenta Group global managers, SCPLLC officers and employees have been "seconded" to work at other SAG subsidiaries, and officers and employees of other Syngenta Group subsidiaries have been "seconded" to work at SCPLLC.

94.    The Syngenta Group's functional management system includes a central global finance function—known as Syngenta Group Treasury—for the entire Syngenta Group.

95.    The finances of all Syngenta Group companies are governed by a global treasury policy that subordinates the financial interests of SAG's subsidiaries, including SCPLLC, to the interests of the Syngenta Group as a whole.

96.    Under the Syngenta Group's global treasury policy, Syngenta Group Treasury controls daily cash sweeps from subsidiaries such as SCPLLC, holds the cash on account, and lends it to other subsidiaries that need liquidity.

97.    The Syngenta Group's global treasury policy does not allow SAG subsidiaries such as SCPLLC to seek or obtain financing from non-Syngenta entities without the approval of Syngenta Group Treasury.

98.    Syngenta Group Treasury also decides whether SCPLLC will issue a dividend or distribution to its direct parent company, and how much that dividend will be.

99.    SCPLLC's board or management approves dividends and distributions mandated by Syngenta Group Treasury without any meaningful deliberation.

100.    In 2011, the U.S. District Court for the Southern District of Illinois held that SAG's unusually high degree of control over SCPLLC made SCPLLC the agent or alter ego of SAG and therefore subjected SAG to jurisdiction in the State of Illinois. *See City of Greenville, lll. v. Syngenta*

*Crop Protection, Inc.,* 830 F. Supp. 2d 550 (S.D. Ill. 2011).

101.    SAG continues to exercise the unusually high degree of control over SCPLLC that led the District Court to find in 2011 that SAG was subject to jurisdiction in the State of Illinois.

102.    SAG, through its agent or alter ego, SCPLLC, does substantial business in the State of Colorado, including El Paso County in Colorado, in the ways previously alleged as to SCPLLC.

### *2. Chevron*

103.    Chevron Chemical Company ("Chevron Chemical") was a corporation organized in 1928 under the laws of the State of Delaware.

104.    In 1997, Chevron Chemical was merged into Chevron Chemical Company LLC ("Chevron Chemical LLC"), a limited liability company organized under the laws of the State of Delaware.

105.    In the mid-2000s, Chevron Chemical LLC was merged into or continued to operate under the same or similar ownership and management as Chevron Phillips Chemical Company LP ("CP Chemical").

106.    CP Chemical is a successor in interest to the crop-protection business of its corporate predecessor Chevron Chemical LLC.

107.    CP Chemical is a successor by merger or continuation of business to its corporate predecessor Chevron Chemical.

108.    Defendant Chevron U.S.A. Inc. ("Chevron USA") is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business in the State of California.

109.    Defendant Chevron USA is a successor in interest to the crop-protection business of its corporate predecessor Chevron Chemical LLC.

110.    Defendant Chevron USA is a successor in interest to the crop-protection business of its corporate predecessor CP Chemical.

111.    Chevron USA's registered agent is located at 2595 Interstate Drive, Suite 103, Harrisburg, PA 17110.

112.    In the mid-2000s, Chevron USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical and Chevron Chemical LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of paraquat products in the United States as alleged in this Complaint.

**B.  Paraquat manufacture, distribution, and sale**

113.    ICI, a legacy company of Syngenta, claims to have discovered the herbicidal properties of paraquat in 1955.

114.    The leading manufacturer of paraquat is Syngenta, which (as ICI) developed the active ingredient in paraquat in the early 1960s.

115.    ICI produced the first commercial paraquat formulation and registered it in England in 1962.

116.    Paraquat was marketed in 1962 under the brand name Gramoxone.

117.    Paraquat first became commercially available for use in the United States in 1964.

118.    In or about 1964, ICI and Chevron Chemical entered into agreements regarding the licensing and distribution of paraquat ("the ICI-Chevron Chemical Agreements").

119.    In or about 1971, ICI Americas became a party to the ICI-Chevron Chemical Agreements on the same terms as ICI.

120.    The ICI-Chevron Chemical Agreements were renewed or otherwise remained in

effect until about 1986.

121.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to their patents and technical information to permit Chevron Chemical to formulate or have formulated, use, and sell paraquat in the United States and to grant sub-licenses to others to do so.

122.    In the ICI-Chevron Chemical Agreements, Chevron Chemical granted ICI and ICI Americas a license to its patents and technical information to permit ICI and ICI Americas to formulate or have formulated, use, and sell paraquat throughout the world and to grant sub-licenses to others to do so.

123.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical agreed to exchange patent and technical information regarding paraquat.

124.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical exclusive rights to distribute and sell paraquat in the United States.

125.    In the ICI-Chevron Chemical Agreements, ICI and ICI Americas granted Chevron Chemical a license to distribute and sell paraquat in the U.S. under the ICI-trademarked brand name Gramoxone.

126.    ICI and ICI Americas and Chevron Chemical entered into the ICI-Chevron Chemical Agreements to divide the worldwide market for paraquat between them.

127.    Under the ICI-Chevron Chemical Agreements, Chevron Chemical distributed and sold paraquat in the U.S. and ICI and ICI Americas distributed and sold paraquat outside the United States.

128.    Under the ICI-Chevron Chemical Agreements and related agreements, both ICI and ICI Americas and Chevron Chemical distributed and sold paraquat under the ICI-trademarked brand

name Gramoxone.

129.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas and Chevron Chemical exchanged patent and technical information regarding paraquat.

130.    Under the ICI-Chevron Chemical Agreements, ICI and ICI Americas provided to Chevron Chemical health and safety and efficacy studies performed or procured by ICI's Central Toxicology Laboratory, which Chevron Chemical then submitted to the USDA and the EPA to secure and maintain the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States.

131.    Under the ICI-Chevron Chemical Agreements and related agreements, ICI and ICI Americas manufactured and sold paraquat to Chevron Chemical that Chevron Chemical then distributed and sold in the United States, including in Colorado, where Chevron Chemical registered paraquat products with the Colorado Department of Agriculture & Consumer Services and marketed, advertised, and promoted them to Colorado distributors, dealers, applicators, and farmers.

132.    Under the ICI-Chevron Chemical Agreements and related agreements, Chevron Chemical distributed and sold paraquat in the United States under the ICI-trademarked brand name Gramoxone and other names, including in Colorado, where Chevron Chemical registered such products with the Colorado Department of Agriculture & Consumer Services to enable them to be lawfully distributed, sold, and used in Colorado, and marketed, advertised, and promoted them to Colorado distributors, dealers, applicators, and farmers.

133.    SAG and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Colorado, where they registered such products with the Colorado

Department of Agriculture & Consumer Services to enable them to be lawfully distributed, sold, and used in Colorado, and marketed, advertised, and promoted them to Colorado distributors, dealers, applicators, and farmers.

134.    SAC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the USDA and the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the United States from about 1964 through the present.

135.    SCPLLC and its corporate predecessors and others with whom they acted in concert have manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1971 through the present, and at all relevant times intended or expected their paraquat products to be distributed and sold in Colorado, where they registered such products with the Colorado Department of Agriculture & Consumer Services to enable them to be lawfully distributed, sold, and used in Colorado, and marketed, advertised, and promoted them to Colorado distributors, dealers, applicators, and farmers.

136.    SCPLLC and its corporate predecessors and others with whom they acted in concert have submitted health and safety and efficacy studies to the EPA to support the registration of paraquat for manufacture, formulation, distribution, and sale for use in the U.S. from about 1971 through the present.

137.    Chevron Chemical manufactured, formulated, distributed, and sold paraquat for use in the United States from about 1964 through at least 1986, acting in concert with ICI and ICI Americas throughout this period, including in Colorado, where Chevron Chemical registered such products with the Colorado Department of Agriculture & Consumer Services to enable them to be lawfully distributed, sold, and used in Colorado, and marketed, advertised, and promoted them to

Colorado distributors, dealers, applicators, and farmers.

138.    From approximately 1964 to approximately 1978, Plaintiff Frank Crosson was repeatedly exposed to, inhaled, ingested, and/or absorbed Defendants' paraquat products while working on his family's 600 acre farm in Cheraw, Colorado where they grew corn and other vegetables.  Plaintiff Frank Crosson mixed and loaded into sprayers paraquat products to use prior to planting to control weeds.

139.    Each exposure of Plaintiff Frank Crosson to Defendants' paraquat products caused or contributed to cause Plaintiff Frank Crosson to develop symptoms consistent with Parkinson's disease for which he was diagnosed with Parkinson's disease in May 2021 when he was 78 years old, by initiating a decades-long process in which oxidation and oxidative stress, created or aggravated by the ongoing redox cycling of paraquat, damaged and interfered with essential functions of dopaminergic neurons in his SNpc, resulting in the ongoing degeneration, as time passed, of progressively more dopaminergic neurons.

140.    Plaintiff Frank Crosson was exposed to Defendants' paraquat products that he and/or others purchased.

141.    When Plaintiff Frank Crosson was exposed to paraquat, he neither knew nor could have expected that taking any precautions, such as personal protective equipment might have prevented or reduced the risk of a neurological injury or neurodegenerative disease caused by exposure to paraquat.

142.    At all relevant times, Plaintiff Frank Crosson did not know or have reason to know that his Parkinson's disease diagnosis was caused or could have been caused by exposure to paraquat.

143.    At all relevant times, Plaintiff Frank Crosson had never read or heard of any articles

22

in newspapers, scientific journals, or other publications that associated Parkinson's disease with paraquat.

144.    At no time when using paraquat himself was Plaintiff Frank Crosson aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

145.    The paraquat to which Plaintiff Frank Crosson was exposed was sold and used in Colorado, and was manufactured, distributed, and on information and belief sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Colorado.

146.    On information and belief, Plaintiff Frank Crosson was exposed to paraquat manufactured, distributed, and sold at different times as to each Defendant, its corporate predecessors, and others with whom they acted in concert, and not necessarily throughout the entire period of his exposure as to any particular Defendant, its corporate predecessors, and others with whom they acted in concert.

147.    On information and belief, Plaintiff Frank Crosson was exposed to paraquat that was sold and used in Colorado, and was manufactured, distributed, and sold by SCPLLC, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in Colorado.

148.    On information and belief, Plaintiff Frank Crosson was exposed to paraquat that was sold and used in Colorado, and was manufactured, distributed, and sold by SAG, its corporate predecessors, and others with whom they acted in concert, including Chevron Chemical, intending or expecting that it would be sold and used in Colorado.

149.    On information and belief, Plaintiff Frank Crosson was exposed to paraquat that was sold and used in Colorado, and was manufactured, distributed, and sold by Chevron Chemical, acting in concert with ICI and ICI Americas, intending or expecting that it would be sold and used in Colorado.

### C. Paraquat use

150.    Since 1964, paraquat has been used in the United States to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

151.    At all relevant times, where paraquat was used, it was commonly used multiple times per year on the same land, particularly when used to control weeds in orchards or on farms with multiple crops planted on the same land within a single growing season or year, and such use was as intended or directed or reasonably foreseeable. The use of Defendants' paraquat for these purposes was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants.

152.    At all relevant times, paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert was typically sold to end-users in the form of liquid concentrates (and less commonly in the form of granular solids) designed to be diluted with water before or after loading it into the tank of a sprayer and applied by spraying it onto target weeds.

153.    At all relevant times, concentrates containing paraquat manufactured, distributed, sold, and sprayed or caused to be sprayed by Defendants, Defendants' corporate predecessors, and

24

others with whom they acted in concert typically were formulated with one or more "surfactants" to increase the ability of the herbicide to stay in contact with the leaf, penetrate the leaf's waxy surface, and enter into plant cells, and the accompanying instructions typically told end-users to add a surfactant or crop oil (which as typically formulated contains a surfactant) before use.

154.    At all relevant times, paraquat typically was applied with a knapsack sprayer, hand-held sprayer, aircraft (i.e., crop duster), truck with attached pressurized tank, or tractor-drawn pressurized tank, and such use was as intended or directed or was reasonably foreseeable.

**D.  Paraquat exposure**

155.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks.

156.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, persons who sprayed paraquat or were in or near areas where it was being or recently had been sprayed would be exposed to paraquat, including as a result of spray drift, the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind, and as a result of contact with sprayed plants.

157.    At all relevant times, it was reasonably foreseeable that when paraquat was used in the manner intended or directed or in a reasonably foreseeable manner, users of paraquat and persons nearby would be exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared.

25

158.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present.

159.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurred.

160.    At all relevant times, it was reasonably foreseeable that paraquat could enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

161.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body via ingestion into the digestive tract could enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract).

162.    At all relevant times, it was reasonably foreseeable that paraquat that entered the human body, whether via absorption, respiration, or ingestion, could enter the bloodstream.

163.    At all relevant times, it was reasonably foreseeable that paraquat that entered the bloodstream could enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier.

164.    At all relevant times, it was reasonably foreseeable that paraquat that entered the nose and nasal passages could enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier.

**E.  Parkinson's disease**

165.    PD is progressive neurodegenerative disorder of the brain that affects primarily the

motor system, the part of the central nervous system that controls movement.

166.    Scientists who study PD generally agree that fewer than 10% of all PD cases are caused by inherited genetic mutations alone, and that more than 90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

### 1. Symptoms and treatment

167.    The characteristic symptoms of PD are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

168.    PD's primary motor symptoms often result in "secondary'' motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

169.    Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of PD, often for years before any of the primary motor symptoms appear.

170.    There is currently no cure for PD. No treatment will slow, stop, or reverse its progression, and the treatments most-commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

### 2. Pathophysiology

171.    The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of PD.

172.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

173.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

174.     Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of PD.

175.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of PD.

176.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

177.     Scientists who study PD generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of PD.

**F.  Paraquat's Toxicity**

178.     Paraquat is highly toxic to both plants and animals.

179.     Paraquat injures and kills plants by creating oxidative stress that causes or contributes to cause the degeneration and death of plant cells.

180.     Paraquat injures and kills humans and other animals by creating oxidative stress that causes or contributes to cause the degeneration and death of animal cells.

181.    Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

182.    The redox cycling of paraquat in living cells interferes with cellular functions that are necessary to sustain life—photosynthesis in the case of plant cells and cellular respiration in the case of animal cells.

183.    The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.

184.    Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical.

185.    Paraquat's redox properties have been known since at least the 1930s.

186.    That paraquat is toxic to the cells of plants and animals because it creates oxidative stress through redox cycling has been known since at least the 1960s.

187.    The surfactants with which the concentrates containing paraquat manufactured, distributed, and sold by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert typically were formulated were likely to increase paraquat's toxicity to humans by increasing its ability to stay in contact with or penetrate the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting

29

airways, the lungs, and the gastrointestinal tract.

### G. Paraquat and Parkinson's Disease

188.    The same redox properties that make paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons—paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons by creating oxidative stress through redox cycling.

189.    Although PD is not known to occur naturally in any species other than humans, PD research is often performed using "animal models," in which scientists artificially produce in laboratory animals' conditions that show features of PD.

190.    Paraquat is one of only a handful of toxins that scientists use to produce animal models of PD.

191.    In animal models of PD, hundreds of studies involving various routes of exposure have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human PD, and motor deficits and behavioral changes consistent with those commonly seen in human PD.

192.    Hundreds of in vitro studies have found that paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

193.    Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between paraquat exposure and PD, including multiple studies finding a two- to five-fold or greater increase in the risk of PD in populations with occupational exposure to paraquat compared to populations without such exposure.

### H.  **Paraquat Regulation**

194.    The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the United States, requires that pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

195.    As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

196.    As a general rule, FIFRA requires registrants to perform health and safety testing of pesticides.

197.    FIFRA does not require the EPA to perform health and safety testing of pesticides itself, and the EPA generally does not perform such testing.

198.    The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.   its composition is such as to warrant the proposed claims for it, 7 U.S.C. § 136a(c)(5)(A);

    b.   its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

    c.   it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

    d.   when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

199.    FIFRA defines "unreasonable adverse effects on the environment'' as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

200.    Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

201.    However, FIFRA further provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

202.    The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person . . . any pesticide which is . . . misbranded." 7 U.S.C. § 136j(a)(1)(E).

203.    A pesticide is misbranded under FIFRA if, among other things:

    a.    its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients that is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

    b.    the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under Section 136a(d) of the title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

    c.    the label does not contain a warning or caution statement that may be necessary and if complied with, together with any requirements imposed under section 136a(d) of the title, is adequate to protect health and the environment," 7 U.S.C.

§ 136(q)(l)(G).

204.    Plaintiff do not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of paraquat or warnings about paraquat, breached a duty to provide adequate packaging for paraquat, or concealed, suppressed, or omitted to disclose any material fact about paraquat or engaged in any unfair or deceptive practice regarding paraquat, that allegation is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice, having rendered the paraquat "misbranded" under FIFRA; however, Plaintiff bring claims and seek relief in this action only under state law, and do not bring any claims or seek any relief in this action under FIFRA.

## V.    ALLEGATIONS COMMON TO SPECIFIC CAUSES OF ACTION

### A.  Strict Product Liability – Design Defect

205.    At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the U.S. paraquat business.

206.    At all relevant times, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Colorado.

207.    At all times relevant to this litigation, Defendants' paraquat products were expected to reach and did reach the intended consumers, handlers, and users or other persons coming into contact with these products in Colorado and throughout the United States, including Plaintiff Frank Crosson, without substantial change in their condition as designed, manufactured,

sold, distributed, labeled, and marketed by Defendants.

208. Plaintiff Frank Crosson was exposed to paraquat sold and used in Colorado that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Colorado.

209. The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed was in a defective condition that made it unreasonably dangerous in violation of Colorado law, at all times relevant to this action, including the time Defendants' paraquat products left control of Defendants. These defects include, but are not limited to, the following:

> a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;
>
> b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure; and
>
> c. The paraquat products were not reasonably safe in design under Colorado law.

34

210.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

211.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

212.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

213.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert was in an unreasonably dangerous condition and Plaintiff Christopher Loftus could not reasonably contemplate, and in fact Plaintiff did not contemplate and did not know, the risk of Parkinson's Disease associated with the paraquat in the course of its ordinary use.

214.    At the time the paraquat that Defendants, Defendants' corporate predecessors, and other with whom they acted in concert was designed, manufactured, distributed, and sold and to which Plaintiff Christopher Loftus was exposed, there existed readily available safer, feasible, alternative designs that were just as functional and reasonably priced as paraquat but would not

have caused Parkinson's Disease upon exposure.

### B.  Strict Product Liability – Failure to Warn

215.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Colorado.

216.    Plaintiff Frank Crosson was exposed to paraquat sold and used in Colorado that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Colorado.

217.    When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold the paraquat to which Plaintiff Frank Crosson was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary care should have known that when used in the intended and directed manner or a reasonably foreseeable manner:

       a.  it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

       b.  when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and

cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

218.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed was in a defective condition that made it unreasonably dangerous when it was used in the intended and directed manner or a reasonably foreseeable manner, in that:

a.    It was not accompanied by directions for use would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or golf courses where it had been sprayed or areas near where it had been sprayed; and

b.    It was not accompanied by a warning that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields, orchards, or golf courses where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

219.    This defective condition existed in the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed when it left the control of Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and was placed into the stream of commerce.

220.    As a result of this defective condition, the paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed either failed to perform in the manner reasonably to be expected in light of its nature and intended function, or the magnitude of the dangers outweighed its utility.

221.    The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

222.    Had an adequate warning, including disclosure of the risks of paraquat exposure and the development of Parkinson's Disease, been included on or with the paraquat products that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Christopher Loftus was exposed, Plaintiff would have read and heeded these warnings and not been exposed to the paraquat.

### C.  Negligence

223.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling pesticides, and designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold and used in Colorado.

224.    Plaintiff Frank Crosson was exposed to paraquat sold and used in Colorado that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Colorado.

225.     The paraquat that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold and to which Plaintiff Frank Crosson was exposed was used in the intended and directed manner or a reasonably foreseeable manner.

226.     At all times relevant to this claim, in designing, manufacturing, packaging, labeling, distributing, and selling paraquat, and in acting in concert with others who did so, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to it, including Plaintiff Frank Crosson.

227.     When Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, packaged, labeled, distributed, and sold the paraquat to which Plaintiff Frank Crosson was exposed, it was reasonably foreseeable, and Defendants, Defendants' corporate predecessors, and others with whom they acted in concert knew or in the exercise of ordinary case should have known, that when paraquat was used in the intended and directed manner or a reasonably foreseeable manner:

> a. it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and
>
> b. when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and

39

cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

228.    In breach of the aforementioned duty to Plaintiff Frank Crosson, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert negligently:

    a.   failed to design, manufacture, formulate, and package paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

    b.   designed, manufactured, and formulated paraquat such that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

    c.   failed to perform adequate testing to determine the extent to which exposure to paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

    d.   failed to perform adequate testing to determine the extent to which paraquat spray

drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

e.    failed to perform adequate testing to determine the extent to which paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

f.    failed to perform adequate testing to determine the extent to which paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure;

g.    failed to direct that paraquat be used in a manner that would have made it unlikely to have been inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards

where it had been sprayed or areas near where it had been sprayed; and

h.  failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure.

229.    If adequate instructions and warnings had been provided, Plaintiff Frank Crosson would have heeded these instructions and warnings and not been exposed to paraquat.

230.    As a direct and proximate result of the failure by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert to include adequate instructions and warnings of the risks of paraquat exposure and Parkinson's Disease, Plaintiff Frank Crosson was exposed to paraquat and subsequently developed Parkinson's Disease, for which he has suffered damages.

231.    As direct and proximate result of the failure Defendants, Defendants' corporate predecessors, and others with whom they acted in concert to design safe products, Plaintiff Frank Crosson was exposed to defective paraquat products and subsequently developed Parkinson's Disease, for which he has suffered damages.

D.  **Breach of Implied Warranty of Merchantability**

232.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling paraquat and other restricted-use pesticides to consumers

and represented themselves out as having knowledge or skill regarding paraquat and other restricted-use pesticides.

233.    At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold paraquat intending or expecting that it would be sold, placed into the stream of commerce, and used in Colorado.

234.    Plaintiff Frank Crosson was exposed to paraquat sold and used in Colorado that Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold intending or expecting that it would be sold and used in Colorado.

235.    At the time of each sale of paraquat to which Plaintiff Frank Crosson was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used.

236.    Defendants, Defendants' corporate predecessors, and others with whom they acted in concert breached this warranty regarding each sale of paraquat to which Plaintiff Frank Crosson was exposed, in that it was defective and not of merchantable quality because it was not fit for the ordinary purposes for which such goods were used, and in particular:

   a.    it was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

   b.    when inhaled, ingested, or absorbed into the bodies of persons who used it, who

were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including PD, to develop long after exposure; and,

c.   the failure to disclose that paraquat had dangerous propensities when used as intended and that that use of and exposure to paraquat carries an increased risk of developing severe injuries, including Parkinson's disease.

237.   These defective conditions existed at the time of each sale of paraquat products manufactured, designed, and distributed by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert and to which Plaintiff Frank Crosson was exposed.

238.   As a direct and proximate result of this breach of warranty by Defendants, Defendants' corporate predecessors, and others with whom they acted in concert, Plaintiff Frank Crosson was exposed to paraquat and developed Parkinson's Disease.

239.   Plaintiff Frank Crosson has provided notice of this breach of implied warranty of merchantability to Defendants, Defendants' corporate predecessors and others with whom they acted in concert.

## VI.   FIRST CAUSE OF ACTION
## PLAINTIFF FRANK CROSSON DEFENDANTS SCPLLC AND SAG
## STRICT PRODUCT LIABILITY – DESIGN DEFECT PERSONAL INJURY

240.   Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

241.   As a direct and proximate result of the defective and unreasonably dangerous

condition of the paraquat manufactured, distributed, and sold by SCPLLC, SAG, and their corporate predecessors, and others with whom they acted in concert Plaintiff Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### VII.    SECOND CAUSE OF ACTION
### PLAINTIFF FRANK CROSSON DEFENDANTS SCPLLC
### AND SAG – FAILURE TO WARN PERSONAL INJURIES

242.    Plaintiff Frank Crosson incorporates by reference the foregoing paragraphs of this Complaint.

243.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of the paraquat manufactured, distributed and sold by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### VIII.    THIRD CAUSE OF ACTION
### PLAINTIFF FRANK CROSSON DEFENDANTS SCPLLC
### AND SAG NEGLIGENCE PERSONAL INJURIES

244.    Plaintiff Frank Crosson incorporates by reference the foregoing paragraphs of this

Complaint.

245. As a direct and proximate result of the negligence of SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### IX.    FOURTH CAUSE OF ACTION
### PLAINTIFF FRANK CROSSON DEFENDANTS SCPLLC AND SAG
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY PERSONAL INJURIES

246. Plaintiff Frank Crosson incorporates by reference the foregoing paragraphs of this Complaint.

247. As a direct and proximate result of the breaches of the implied warranty of merchantability by SCPLLC, SAG, their corporate predecessors, and others with whom they acted in concert, Plaintiff Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### X.    FIFTH CAUSE OF ACTION
### PLAINTIFF BARBARA CROSSON AGAINST DEFENDANTS SCPLLC AND SAG
### LOSS OF CONSORTIUM

248.    Plaintiff Barbara Crosson incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

249.    As a direct and proximate result of the wrongful and negligent acts of the Defendants in proximately causing Plaintiff Frank Crosson's injuries, including but not limited to Parkinson's disease, Plaintiff Barbara Crosson has suffered and will continue to suffer in the future, loss of consortium, loss of support and services, loss of love, companionship, affection, society, sexual relations, and other damages allowed under the laws of Colorado.

250.    As a direct and proximate result of wrongful and negligent acts of the Defendants in proximately causing Plaintiff Frank Crosson's injuries, Plaintiff Barbara Crosson seeks damages for recovery of her loss of consortium, loss of support and services, loss of love, companionship, affection, society, sexual relations, among other damages and other damages allowed under the laws of Colorado.

### XI.    SIXTH CAUSE OF ACTION
### PLAINTIFF FRANK CROSSON DEFENDANT CHEVRON U.S.A. INC.
### STRICT PRODUCT LIABILITY – DESIGN DEFECT PERSONAL INJURIES

251.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

252.    As a direct and proximate result of the defective and unreasonably dangerous condition of the paraquat manufactured, distributed, and sold by Chevron U.S.A. Inc., their corporate predecessors, and others with whom they acted in concert, Plaintiff Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise

would have earned and will continue to do so for the remainder of his life; and has incurred

reasonable expenses for necessary medical treatment and will continue to do so for the remainder

of his life.

## XII.    SEVENTH CAUSE OF ACTION
## PLAINTIFF FRANK CROSSON DEFENDANT CHEVRON U.S.A. INC.
## FAILURE TO WARN PERSONAL INJURIES

253.    Plaintiff Frank Crosson incorporates by reference the foregoing paragraphs of this

Complaint.

254.    As a direct and proximate result of the lack of adequate directions for the use of

and warnings about the dangers of the paraquat manufactured, distributed, and sold by Chevron

U.S.A. Inc., their corporate predecessors, and others with whom they acted in concert, Plaintiff

Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain,

mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered

the loss of a normal life and will continue to do so for the remainder of his life; has lost income

that he otherwise would have earned and will continue to do so for the remainder of his life; and

has incurred reasonable expenses for necessary medical treatment and will continue to do so for

the remainder of his life.

## XIII.   EIGHTH CAUSE OF ACTION
## PLAINTIFF FRANK CROSSON DEFENDANT CHEVRON U.S.A. INC.
## NEGLIGENCE PERSONAL INJURIES

255.    Plaintiff Frank Crosson incorporates by reference the foregoing paragraphs of this

Complaint.

256.    As a direct and proximate result of the negligence of Chevron Chemical and others

with whom it acted in concert, Plaintiff Frank Crosson developed Parkinson's disease; has suffered

severe and permanent physical pain, mental anguish, and disability, and will continue to do so for

the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

### XIV.   NINTH CAUSE OF ACTION
### PLAINTIFF FRANK CROSSON DEFENDANT CHEVRON U.S.A. INC.
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### PERSONAL INJURIES

257.    Plaintiff Frank Crosson incorporates by reference the foregoing paragraphs of this Complaint.

258.    As a direct and proximate result of the breaches of the implied warranty of merchantability by Chevron Chemical and others with whom it acted in concert, Plaintiff Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

259.    As a direct and proximate result of the breach of implied warranty by Chevron Chemical and others with whom it acted in concert, Plaintiff Frank Crosson developed Parkinson's disease; has suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of his life; has suffered the loss of a normal life and will continue to do so for the remainder of his life; has lost income that he otherwise would have earned and will continue to do so for the remainder of his life; and has incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of his life.

## XV.    TENTH CAUSE OF ACTION
## PLAINTIFF BARBARA CROSSON AGAINST DEFENDANT CHEVRON U.S.A. INC.
## LOSS OF CONSORTIUM

260.    Plaintiff Barbara Crosson, incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

261.    At all relevant times alleged herein, the Plaintiffs were married and continue to be married.

262.    As a result of the wrongful and negligent acts of the Defendants in proximately causing Plaintiff Frank Crosson's injuries, including but not limited to Parkinson's disease, Plaintiff Barbara Crosson has been deprived of the services, society, companionship, and consortium of her husband and has been required to care for him and to expend funds for his medical care and treatment.

263.    As a direct and proximate result of the wrongful and negligent acts of the Defendants in proximately causing Plaintiff Frank Crosson's injuries, including but not limited to Parkinson's disease, Plaintiff Barbara Crosson has suffered and will continue to suffer in the future, loss of consortium, loss of support and services, loss of love, companionship, affection, society, sexual relations, and other damages allowed under the laws of Colorado.

264.    As a direct and proximate result of wrongful and negligent acts of the Defendants in proximately causing Plaintiff Frank Crosson's injuries, Plaintiff Barbara Crosson seeks damages for recovery of her loss of consortium, loss of support and services, loss of love, companionship, affection, society, sexual relations, among other damages and other damages allowed under the laws of Colorado.

## XVI. <u>DAMAGES</u>

265.    Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

266.    As a direct and proximate result of Defendants' tortious conduct and breach of duties as set forth herein, Plaintiffs are entitled to be compensated for their damages.

267.    As a direct, legal, and proximate result of the culpability and fault of Defendants, be such fault through strict liability, negligence or otherwise, Plaintiff Barbara Crosson, the lawful wife of Plaintiff Frank Crosson, suffered the loss of support, services, love, companionship, affection, society, intimate relations, and other elements of consortium, all to her general damage in an amount in excess of the jurisdictional minimum of this Court.

268.    Defendants are liable for punitive and/or exemplary damages under choice of law principles. Defendants acted with willful disregard of the rights of the Plaintiffs and the public. Defendants' conduct was outrageous and reckless toward the safety of the Plaintiffs and the public.

269.    Plaintiffs further reserve and hereby claim all other rights and remedies arising from the Plaintiffs' injuries.

270.    All of the above damages are in an amount which will be proved at trial.

## XVII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them as hereinafter set forth.

271.    As a result of the foregoing, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, for compensatory damages, costs, pre- and post-judgment interest, and attorneys' fees, severally for punitive damages, and for such further relief to which they may show themselves to be entitled.

## XVIII. DEMAND FOR JURY TRIAL

272.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs respectfully demand a jury trial on all issues triable by jury.

Dated:  January 17, 2025                    Respectfully Submitted,

                                            /s/  *Kristine K. Kraft*
                                            Kristine K. Kraft, IL 6208286
                                            **SCHLICHTER BOGARD, LLP**
                                            100 South 4th Street, Suite 1200
                                            Saint Louis, MO 63102
                                            Ph: 314-621-6115
                                            F: 314-621-1365
                                            E: kkraft@uselaws.com